## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

ROGER G. WOODSON, INDIVIDUALLY AND AS ADMINISTRATOR, ETC.
v. CELINA MUTUAL INSURANCE COMPANY, ET AL.

November 30, 1970.

Record No. 7219.

Present, All the Justices.

*Donald C. Crounse,* for appellant.

*John S. Stump (Boothe, Dudley, Koontz, Blankingship & Stump,* on brief), for appellees.

HARRISON, J., delivered the opinion of the court.

Arnold M. Delawder was killed in Fairfax County, Virginia on December 3, 1966, while operating a 1955 Pontiac automobile. This vehicle collided with an automobile driven by Roger G. Woodson, in which his wife, Doris M. Woodson, was a passenger. Woodson, individually and as the administrator of his wife's estate, filed actions to recover for personal injuries to himself and for the wrongful death of his wife. Named as defendants were James D. Swinson, administrator of the estate of Arnold M. Delawder and Junior Hinkle, t/a Hinkle's Used Cars, a resident of Petersburg, West Virginia.

Thereafter appellee, Celina Mutual Insurance Company, filed a motion for declaratory judgment in the court below against Hinkle, Delawder's administrator, Woodson and Mrs. Woodson's administrator. It prayed for a declaration that Hinkle was not the owner of the Pontiac automobile involved in the accident, and that Celina was not obligated, by reason of a liability insurance policy issued by it to Hinkle, to defend any action or to pay any judgment entered against Swinson, administrator of Delawder, deceased, arising out of the accident. The lower court granted Celina the relief it sought. We awarded Roger G. Woodson, individually and as administrator, an appeal from its final decree.

On December 1, 1966 Arnold M. Delawder, who resided in Fairfax City, Virginia, was visiting his sister in Petersburg, West Virginia. While there he negotiated with Junior Hinkle for the purchase of a used 1955 Pontiac automobile. Delawder signed a written agreement to purchase the vehicle for $100 cash. Instead of paying cash, Delawder gave Hinkle his check, dated December 1, 1966, for $101, noting thereon that it was for "1955 Pon". The check was drawn on the Potomac Valley Bank of Petersburg, West Virginia.

At the time of the transaction Delawder was issued a temporary registration plate, which was attached to the car. A temporary registration certificate, on the official form used by the West Virginia Department of Motor Vehicles, reflected the application by Delawder for the registration plate, described the car and was signed by Hinkle and Delawder.

At the request of Hinkle, John Hyre, an official of the Grant County Bank, and a notary public, prepared and notarized the title papers for the vehicle. This particular automobile had been acquired by Hinkle from Howard Hartman. It was necessary that the title be reassigned from the dealer to Delawder, and for the latter to make application for a new title. Hyre testified that he typed the title trans-

fer document and witnessed and acknowledged the signatures of both Hinkle and Delawder. He said that after he notarized the signatures he handed the papers to Hinkle, in an envelope addressed to the West Virginia Department of Motor Vehicles, and that Hinkle gave it to Delawder. At the same time Delawder was given possession of the car and left the garage with it. Two days later he had the wreck in Virginia.

The check given Hinkle covered the purchase price of the car plus a dollar for the temporary registration. Hinkle said that the transaction was supposed to have been for cash, but he accepted a check when Delawder assured him that it was good. When he called the bank the following morning he found that Delawder had no account there.

There was some conflict in the evidence concerning the delivery of the title by Hinkle to Delawder. Hinkle says that the title was given to Delawder. George Hawks testified that he saw him come out of Hinkle's office with an envelope in his hand. Mrs. Frances E. Freed, a sister of Delawder, testified that on the day he was killed, she asked Hinkle if he "made" her brother the title and Hinkle responded "no", and that she further asked if her brother gave Hinkle a check and he said "yes". Appellant also introduced evidence that Hinkle had known Delawder over a period of years, and knew that he had served time in the penitentiary for forgery and had given bad checks. Hinkle denied such knowledge.

The title to the vehicle has never been found. Neither the Virginia nor the West Virginia Division of Motor Vehicles has any record of the transaction in question.

The trial court found as a fact that Hinkle executed the reassignment portion of the title to the Pontiac vehicle; that Delawder signed the application for title contained in the same document; and that Delawder was operating the vehicle in question at the time of the accident pursuant to an agreement of sale. These findings are fully supported by the evidence.

The court below found that appellee had not shown by a preponderance of the evidence that the reassigned certificate of title was delivered to Delawder by Hinkle. Celina assigned cross-error to this action.

Irrespective of its physical delivery, the title had been assigned by Hinkle and application for a new title had been executed by Delawder. No lien was reserved on the car by the dealer. It is possible

that he may have retained custody of the title pending payment of the check and in aid of its collection. This did not operate to prevent passage of the title to Delawder or to reinvest title in Hinkle. Neither did it interfere with the possession, use and control of the vehicle which was immediately assumed by Delawder.

Article 4, § 17A-4-4 of the Motor Vehicle Administration Act of the Code of West Virginia provides, in pertinent part, as follows:

> "When the transferee of a vehicle is a dealer who holds the same for resale . . . such dealer upon transferring his title or interest to another person shall execute and acknowledge an assignment and warranty of title upon the certificate of title and deliver the same not later than five days from date of sale to the person to whom such transfer is made."

Admittedly the vehicle in question had been acquired by Hinkle, a dealer, from Hartman and was held for resale. The evidence of Mr. Hyre established that the title was duly assigned to Delawder on the certificate of title, and contemporaneously therewith application for a new title was executed by the purchaser. Notwithstanding physical delivery of the title to the purchaser may not have been made on December 1, 1966, it is clear that the title to the vehicle had passed to Delawder by virtue of the purchase agreement signed by him and the execution and acknowledgment of the title assignment to him by Hinkle. The accident in Fairfax occurred before the expiration of the five-day period during which Hinkle was required by statute to deliver the title to the purchaser.

In our consideration of this case, we are controlled by the law of the State of West Virginia. The transaction which involved the purchase of the Pontiac vehicle and the transfer of its title occurred in that state. Likewise the transaction which involved the issuance of a policy of automobile liability insurance to Hinkle by Celina occurred in that jurisdiction.

In *C. I. T. Corp. v. Guy*, 170 Va. 16, 22, 195 S. E. 659, 661 (1938), the court said:

> "The nature, validity and interpretation of contracts are governed by the law of the place where made, unless the contrary appears to be the express intention of the parties."

*See also Rose v. The Travelers Indemnity Company*, 209 Va. 755,

167 S. E. 2d 339 (1969); 16 Am. Jur. 2d, *Conflict of Laws*, §§ 30, 31 (1964); 15A C. J. S., *Conflict of Laws*, § 18(4) (1967); 4 Mich. Jur., *Conflict of Laws*, § 19 (1949).

As was pointed out in *Holt Motors, Inc.* v. *Casto*, 136 W. Va. 284, 67 S. E. 2d 432 (1951), the statutory requirements incident to the transfer of a title to a vehicle differ in Virginia and West Virginia. In West Virginia "[a] certificate of title [to an automobile] is not a warrant of ownership. It does not convey title or determine or affect ownership, but is merely evidence in establishing title, which may be rebutted by other evidence". *Commercial Credit Corporation* v. *Citizens National Bank*, 148 W. Va. 198, 205, 133 S. E. 2d 720, 725 (1963).

Our conclusion that title, ownership and possession of the 1955 Pontiac automobile passed from Hinkle to Delawder on December 1, 1966 disposes of appellant's contention that Celina's policy to Hinkle afforded to Delawder coverage on the day of the accident.

If Delawder was covered under Celina's policy, it was by virtue of its "omnibus coverage" provision whereby protection was afforded to one using or driving the car with the permission of the named insured.

Manifestly Delawder was not driving the Pontiac with the "permission" of Hinkle as the word permission is used in the policy. Delawder drove the car from Hinkle's garage on December 1st after having purchased it, given his check in payment, secured temporary license plates and temporary registration certificate, witnessed the assignment of the title to him and applied for a new title. Having done these things, he became the owner of the car and the sole person having any control over it. Hinkle was then in no position to grant or deny Delawder permission to use the automobile. He had sold it, accepted a check in payment, assigned the title and delivered possession. The fact that the purchase was made with a check that subsequently proved to be "bad" may have given Hinkle a right of action against Delawder but it did not reinvest title, possession or ownership of the car in Hinkle.

As we pointed out in *Va. Auto Mut. Ins. Co.* v. *Brillhart*, 187 Va. 336, 342, 46 S. E. 2d 377, 380 (1948):

" 'Permission' or 'consent' to use or drive a car within the meaning of such a provision must come from someone who is in a position to give or grant it. His relation to or control over the car must

be such that he has a right to give or withhold the permission or consent to use it."

In *Nationwide Mut. Ins. Co. v. Cole*, 203 Va. 337, 341, 124 S. E. 2d 203, 206 (1962), we dealt specifically with the issue under discussion. In an opinion by Mr. Chief Justice Eggleston, we said:

"It is well settled that 'permission' to drive a car, within the meaning of the omnibus coverage clause, connotes the power to grant or withhold it. Therefore, in order for one's use and operation of an automobile to be within the meaning of the omnibus coverage clause requiring the permission of the named insured, the latter must, as a general rule, own the insured vehicle or have such an interest in it that he is entitled to the possession and control of the vehicle and in a position to give such permission. If the named insured has sold the vehicle, its subsequent use by the buyer is by virtue of the latter's ownership and his right to control it and not by virtue of the permission of the named insured seller. [Citing numerous cases and secondary authorities.]

"As is said in *Byrd v. American Guarantee & Liability Ins. Co., supra*, 180 F. 2d 249, 'There is no insurance separate and distinct from the ownership of the car.' This is so because an owner's motor vehicle liability policy is a contract between the insurance company and the owner."

We find no decision of the Supreme Court of West Virginia which deals with the precise point involved here. Applying principles which are well established in Virginia and other jurisdictions to the instant case, when Hinkle, the named insured in Celina's policy, assigned the title, transferred the ownership and delivered possession of the car to Delawder, its subsequent use and operation by Delawder at the time of the accident was not with the permission of the named insured, Hinkle, within the meaning of the omnibus coverage provision contained in the policy. We find in the record no legal basis for holding that Celina's policy covered the use of the car by Delawder at that time.

Accordingly, the decree of the lower court is

*Affirmed.*