**UNITED COAL COMPANY, et al., Plaintiffs,**

v.

**LAND USE CORPORATION, Defendant.**

**Civ. A. No. 82–0218–A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Dec. 8, 1983.

W. Challen Walling, James P. Jones, Bristol, Va., for plaintiffs.

Roger W. Tompkins, Thomas E. Scarr, Charleston, W. Va., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

The plaintiffs, United Coal Company, incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Bristol, Virginia, and Harbour Marine, Inc., incorporated under the laws of the State of Ohio with its principal place of business in Proctorville, Ohio, brought this action for declaratory judgment and injunctive relief against Land Use Corporation, organized under the laws of the State of West Virginia with its principal place of business in Summersville, West Virginia. Jurisdiction is predicated upon diversity of citizenship and more than ten thousand dollars ($10,000) in controversy, exclusive of interest and costs. 28 U.S.C. § 1332.

Personal jurisdiction over the nonresident defendant is achieved, if at all, under the Virginia long-arm statute, Va.Code § 8.01–328.1.A.1. (Repl.Vol.1977 & Supp. 1983), with service of process pursuant to Rule 4(e) of the Federal Rules of Civil Procedure and Va.Code § 8.01–329 (Repl. Vol.1977 & Supp.1983), authorizing substituted service on the Secretary of the Commonwealth of Virginia as statutory agent for the nonresident defendant.

The issues presented are whether this court can exercise personal jurisdiction over a nonresident corporation which contracted with a resident corporation for the resident to act as an exclusive sales agent of the nonresident in the selling of coal to Appalachian Power Company and whether the claim arose in this judicial district for purposes of the federal venue statute.

### I.

This case focuses on a contract to buy and sell coal, which the plaintiffs and defendant have negotiated, executed and partially performed. The court briefly reviews the essential facts so that the jurisdictional and venue issues may be determined.

In 1980 Hobert Orton, a consultant and intermediary exploring potential coal sales, contacted Ralph Haring, Director of International Marketing at United Coal Company. Acting as a broker to find buyers of coal mined by Land Use Corporation, Orton discussed with Haring the possibility of selling coal to United Coal and its affiliates and subsidiaries. After various telephone conversations between Orton, William Bright of Land Use, and James Williamson of United Coal's Tri-State Division, Bright

shipped a test order of coal to United Coal. When the results proved to be promising, Williamson and two others visited the mining operation of Land Use near Summersville, West Virginia, and met with Bright. These discussions over the telephone and at the mine concluded in an agreement for Land Use to sell to United Coal Company coal on the "spot" market. Garry Keene of United Coal and Williamson journeyed to the mine in West Virginia several times in 1980 and 1981 to help with a truckers' strike and to check the quality of coal. Land Use sold coal on the "spot" market to United Coal as it was needed from April 1980 through September 1981 when Bright cancelled the sales. According to Williamson's affidavit, neither company was committed to buy or to sell any specified amount of coal over any certain period. The coal was shipped by truck. Bright's second affidavit reveals that the terms of the agreement contemplated that Land Use load the coal in West Virginia. When United Coal directed that the coal be shipped to Proctorville, Ohio, Land Use would pay the independent truckers and United Coal would reimburse it these costs.

Also as a result of the meeting between Haring and Orton, National Collieries, then an affiliate of United Coal, bought some coal from Land Use on a "spot" market basis for exporting purposes. According to Haring's first affidavit, only four purchases were made between June 1980 and June 1981.

The resale of these "spot" purchases to American Electric Power Company, as part of one continuous contract now before the court, is in some dispute. The defendant asserts that these visits and first negotiations are necessarily part of the contract in dispute, for United Coal sold most of the coal to American Electric Power Company or a subsidiary. The plaintiffs, on the other hand, contend that the transactions dealt solely with "spot" market purchases. Resolution of this conflict, however, is unnecessary to the determination of the issue at bar.

On August 12, 1983 Orton and Bright toured the facilities of United Coal in Bristol, Virginia. Bright claims that during the visit the parties discussed "spot market sales, the type of product Land Use had available, and the possibility of a long-term arrangement between our two companies." (Bright's second affidavit 3). Haring asserts that they discussed "the operations of Land Use, the type of product it had available, and the general services and the like it could offer to United Coal regarding domestic and export coal." (Haring's first affidavit 2). Gary Chilcot of United Coal describes the discussions as generally explaining the operations of Land Use and soliciting business. (Chilcot's first affidavit 1). These affidavits show that the foundation for a long-term arrangement apparently was laid.

Orton continued to urge United Coal to purchase from Land Use. On July 30, 1981 he and his wife flew from New Jersey to Bristol. The next day Orton met with Chilcot to begin negotiations for a long-term coal sales agreement FOB barge at a barge loading facility on the Kanawha River between Land Use, supplier, and United Coal, buyer. After a week of consultation with both parties, Orton successfully brought them together. On August 6 and 7, Bright and Lawson of Land Use met with Chilcot and Haring to negotiate a contract whereby Land Use would supply coal to Harbour Marine, an wholly-owned subsidiary of United Coal. Harbour Marine holds a contract for coal supply with Appalachian Power Company. During the negotiations in Bristol, general terms and conditions of the contract were dickered. The parties seemed to reach some specifics during negotiation, and Orton recalls that exact percentages were being negotiated when the meeting concluded on August 7. (Orton's affidavit 4). Following the parties' exchanges of telephone conversations and telexes, Chilcot executed the final draft of the letter agreement dated August 21, 1981 in Bristol and sent it to Bright in West Virginia. There Bright signed the agreement and returned it to United Coal. Under the letter agreement United Coal was

to buy and apply approximately fifteen thousand (15,000) tons coal per month that Land Use mined "on our present Harbour Marine Contract with AEP." [1]

At some point in the negotiations Chilcot or Bright insisted that United Coal would be the exclusive sales agent for Land Use in the supplying of coal to Appalachian Power Company.[2] Notwithstanding who insisted upon the exclusive agency term, Bright agreed to it,[3] and it is incorporated in the final letter agreement.[4]

Seven weeks later Land Use paid Orton for his brokerage services of bringing the parties together. The plaintiffs did not furnish Orton any compensation for his involvement in this transaction.

Plaintiffs allege that prior to November 1981 approximately fifteen thousand (15,000) tons of coal per month were shipped and that from November 1981 until April 1982 Land Use shipped approximately twenty-one thousand (21,000) tons of coal per month to Harbour Marine in Ohio. According to Chilcot's first affidavit, "[a]ll Appalachian Power Company payments for Land Use coal were made in Virginia and United Coal's payments to Land Use in regard thereto were written drawn on Virginia banks and finally paid in Virginia. In addition, Land Use coal was tested, for quality control purposes, by United Coal personnel in Buchanan County, Virginia." (Chilcot's first affidavit 3). Furthermore, employees of United Coal, as agents for Land Use, frequently contacted American Electric Power Company and its subsidiary Appalachian Power Company concerning "coal deliveries, quality control problems, shipment dates, delivery problems, barge scheduling, general contract problems and correspondence, price escalations, premium penalties and the like. Further such important functions as calculation of premium penalties (based on American Electric Power's information), preparing and distributing to Land Use the monthly analysis statements, and determination of price escalations were performed in United Coal's Bristol, Virginia office." *Id.* United Coal performed its duties as agent for Land Use through its offices in Bristol.

Apparently, problems arose under the Harbour Marine contract with Appalachian Power Company, for a letter of May 14, 1982 from American Electric Power Service Corporation to United Coal sets forth a schedule of reduced coal shipments. During April through July 1982 Bright met four times with James McGlothlin, president of United Coal and Harbour Marine. Plaintiffs contend that, on behalf of Land Use, Bright asserted:

(a) That HMI [Harbour Marine] and, presumably, UCC [United Coal], are obligated to purchase from LUC [Land Use], under the terms of the Chilcot letter 25,000 tons per month through December, 1982;

(b) That the amendment set forth in the May 14, 1982 letter (Exhibit C) by which 350,000 tons of coal are to be delivered by HMI to APCO [Appalachian Power Company] at the rate of 116,667 tons per year for 1983, 1984 and 1985 constitutes

---

1. The second paragraph of the final letter agreement states:

 2. Beginning the month of September 1981, UCC will buy and apply approximately 15,000 tons per month of LUC coal trucked and loaded into barges on the Kanawaha [sic] River on our present Harbour Marine Contract with AEP.

2. Chilcot asserts that Land Use appointed United Coal its exclusive sales agent in dealing with American Electric Power Company or its subsidiaries and that United Coal carried out its contractual duties in Virginia. (Chilcot's first affidavit 4). Bright avers that Chilcot insisted upon United Coal serving as the exclusive agent

of Land Use in transactions with American Electric Power. (Bright's second affidavit 5).

3. Bright affirmatively states, "I ultimately agreed to this [exclusive agency], even though it would have been to my advantage to be able to continue to sell directly to AEP as I had been doing prior to the Agreement." (Bright's second affidavit 5).

4. Paragraph 1 of the letter agreement dated August 21, 1981 provides:

 Effective immediately, UCC will represent Land Use Corporation as exclusive sales agent at American Electric Power Company for the term of this agreement.

an extension and/or renegotiation of the APCO Contract which, pursuant to the Chilcot Letter, gives it the right and option to require that HMI and UCC purchase 40,000 tons of coal per month for a period of 10 years from it; and

(c) That, pursuant to the terms of the Chilcot Letter, LUC has the right and option to require HMI and UCC to purchase from it 40,000 tons of coal per month for a period of 10 years in the event HMI or UCC contracts with American Electric Power or any of its affiliates or subsidiaries, including Appalachian Power Company, for any shipments of coal on the Ohio River.

The parties attempted to settle their differences to little avail.

Shortly after the meetings ceased, plaintiffs filed this diversity action. This case is before the court on defendant's motion to dismiss for lack of jurisdiction over the person, for improper venue, and for insufficiency of service of process pursuant to Rules 12(b)(2), (3), and (5), supported by defendant's memoranda of law and affidavits. Plaintiffs have submitted a memorandum of law in opposition to the motion accompanied by supporting affidavits.

## II

The existence of personal jurisdiction depends upon reasonable notice that an action has been brought, *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 313–14, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950), and "a sufficient connection between the defendant and the forum state to make it fair to require defense of the action in the forum." *Milliken v. Meyer*, 311 U.S. 457, 463–64, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940); *Kulko v. Superior Court*, 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978). This part of the opinion is concerned with the nexus between the defendant and forum state.

When personal jurisdiction is based upon the long-arm statute, a two-step inquiry generally is applied: "(1) whether asserting in personam jurisdiction over the defendant is contemplated by the statute, and (2) if so, whether to assert jurisdiction would violate the [D]ue [P]rocess [C]lause of the [f]ourteenth [a]mendment." *Viers v. Mount,* 466 F.Supp. 187, 189–90 (W.D.Va.1979). *See Peanut Corp. of America v. Hollywood Brands, Inc.,* 696 F.2d 311, 313 (4th Cir.1982); *Haynes v. James H. Carr, Inc.,* 427 F.2d 700, 703 (4th Cir.1970). The plaintiffs have the burden of proving that the court has in personam jurisdiction over the defendants. *Bartholomew v. Virginia Chiropractors Ass'n,* 612 F.2d 812, 816 (4th Cir.1979), *cert. denied,* 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980); *Willis v. Semmes, Bowen & Semmes,* 441 F.Supp. 1235, 1239 (E.D.Va.1977). While the Fourth Circuit Court of Appeals recently noted that these two inquiries were interrelated, the court applied the two-step analysis out of an abundance of caution, rather than merging the analysis. *Peanut Corp.,* 696 F.2d at 313. This court will proceed likewise.

### A. The Statutory Scheme

The long-arm statute provides, in pertinent part:

A. A court may exercise personal jurisdiction over a person, who acts directly or by an agent as to a cause of action arising from the person's:

1. Transacting any business in this Commonwealth; ....

B. When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him; ....

Va.Code § 8.01–328.1 (Repl.Vol.1977 & Supp.1983). The Virginia Supreme Court has determined that the purpose of the long-arm statute is "to assert jurisdiction, to the extent permissible under the Due Process Clause of the Constitution of the United States, over nonresidents who engage in some purposeful activity in Virginia." *Danville Plywood Corp. v. Plain & Fancy Kitchens, Inc.,* 218 Va. 533, 534, 238 S.E.2d 800, 802 (1977); *Carmichael v. Snyder,* 209 Va. 451, 456, 164 S.E.2d 703, 707 (1968). Interpreting the language of

"transacting *any* business in this Commonwealth," the Virginia Supreme Court has held that one single transaction in Virginia will confer jurisdiction upon the courts of the Commonwealth. *Kolbe, Inc. v. Chromodern, Inc.*, 211 Va. 736, 740, 180 S.E.2d 664, 667 (1971) (emphasis added); *Ajax Realty Corp. v. J.F. Zook, Inc.*, 493 F.2d 818, 820 (4th Cir.1972). *See McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). Several types of activities have been held to be transacting business. Most recently, the Virginia Supreme Court concluded in a breach of contract action that entering into an employment contract in the Commonwealth, which required the employee to move to California, is a sufficient transaction to bring him under the statute. *I.T. Sales v. Dry*, 222 Va. 6, 9, 278 S.E.2d 789, 791 (1981). Furthermore, when a California corporation makes a sale to and secures a purchase order from a dealer in Virginia for a delivery out of state, the California Corporation has conducted business in the Commonwealth, invoking the court's jurisdiction over it. *Kolbe, Inc.*, 211 Va. at 741, 180 S.E.2d at 667–68. However, the court has decided that the technical acceptance by performance and the shift of the risk of loss to a nonresident corporation when the products were placed in possession of a common carrier in Virginia do not give the court jurisdiction. *Danville Plywood*, 218 Va. at 535, 238 S.E.2d at 802.

Several federal courts also have applied the statute. The Fourth Circuit Court of Appeal has held that solicitation of business using manufacturer's representatives and advertising, direct billing, distribution of products in the state, a modified letter received in Virginia, telephonic negotiations with one party in the Commonwealth, and numerous written communications sent to Virginia constitutes sufficient "contracting" to invoke long-arm jurisdiction under the provision of "transacting business." *Peanut Corp.*, 696 F.2d at 314. In an earlier case, the court refused to find jurisdiction under that provision when the facts revealed that a manufacturer shipped prepaid frames to Virginia as an accommodation or as an agent without knowledge of frame's resale. *Ajax Realty Corp.*, 493 F.2d at 821 (the court found jurisdiction, however, under Va.Code § 8–81.2(a)(5) causing injury by breach of warranty). This court has concluded that "mere contract negotiations carried out in Virginia between a state citizen and a nonresident, with execution and performance of the contract in a foreign forum" is not a sufficient transaction of business to assert jurisdiction over the defendant. *Mount*, 466 F.Supp. at 191. Judge Turk has determined that the aggregate contacts of paying the purchase price in the forum state, delivering purchased goods in the state, traveling to the state for negotiations or inspections making a contract with an economic impact on the state, and construing the agreement according to the law of the forum, constituted "transacting business" in Virginia. *General Electric Co. v. Rose Intern., Inc.*, 475 F.Supp. 602, 606–07 (W.D.Va.1979).

■ Accordingly, Land Use has transacted business in Virginia within the meaning of the statute. While one substantial transaction is sufficient to satisfy the statute, the defendant has conducted several activities which, in aggregate, consist of "transacting business". Land Use has sent several telephonic, telexic, and written communications to Virginia; negotiated the original contract and this dispute in the state; received a signed letter-agreement from Virginia and returned it there; authorized a Virginia corporation to be its exclusive sales agent with a third corporation; received payments allegedly drawn on and finally paid by Virginia banks; obtained shipment orders from its agent; and reaped the benefits of having their Virginia agent sell the mined product. Although the coal never passed through the Commonwealth and the formal contract was not executed by the defendant in Virginia, these various business activities based on the formal contract term and subsequent performance hereunder are adequate to establish a transaction of business within the Commonwealth.

## B. Due Process Considerations

Essentially the defendant argues that its only contacts with Virginia are visits made by Bright and other employees of Land Use during negotiations over the contract. Land Use asserts that following the decision in *Mount*, this court has no jurisdiction to grant declaratory and injunctive relief, since the contract was executed in West Virginia. *See Davis H. Elliot Co. v. Caribbean Utilities Co., Ltd.*, 64 F.R.D. 594 (W.D.Va.1974). In *Mount*, this court held that one contact with Virginia consisting of negotiations of the essential terms of a subsequent contract fails to provide the nexus with Virginia necessary to assert personal jurisdiction over the defendant because it is doubtful that a nonresident would "purposefully avail" himself of the privilege of conducting business in the state. 466 F.Supp. at 191 (citations omitted). The plaintiffs, on the other hand, assert that the case at bar is analogous to the facts in *Rose*. Judge Turk held that the "sum total" of the defendant's activities which led to the purchase of certain General Electric assets and inventory met the "minimum contacts" requirements of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). 475 F.Supp. 606–07.

At the outset, the court distinguishes the *Mount* case from the facts presented here. Although the earlier case involved a breach of contract action, the only contacts with Virginia were telephone calls, visiting and inspecting the quality of Vier's work, and negotiating an oral contract at the Dixie Drive-in in Grundy, Virginia. Under the terms of the contract plaintiffs were to construct a house in Kentucky; both execution of a written agreement and performance occurred in Kentucky. While this court held that mere contract negotiations are not sufficient to assert in personam jurisdiction over the defendant,[5] negotiations coupled with other activities happening in the Commonwealth may be sufficient to invoke jurisdiction if they meet the limitations of the Due Process Clause of the fourteenth amendment.

The parameters of the due process inquiry are well defined. Where the person over whom jurisdiction is asserted has established "certain minimum contacts" with the forum such that requiring him to defend his interests in the forum would not "offend 'traditional notions of fair play and substantial justice,'" *International Shoe Co. v. Washington*, 326 U.S. at 316, 66 S.Ct. at 158, and where he has "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958), jurisdiction will be upheld. The action upon which the suit is based must have a substantial connection

5. This court has searched the reporters and has not found a case holding contrary to the decision in *Mount*. There are several reported opinions which determine that federal district courts have *in personam* jurisdiction over the defendant based upon negotiations plus other contacts. *See* e.g., *Thomas P. Gonzalez Corp. v. Consejo Nacional*, 614 F.2d 1247, 1253–54 (9th Cir.1980) (Use of the mails, telephones or other communications do not establish a systematic and continuous course of business for California court to exercise personal jurisdiction.); *Data Disc, Inc. v. Systems Tech. Assoc., Inc.*, 557 F.2d 1280, 1287–88 (9th Cir.1977) (The breach of contract claim arose from an agreement partially negotiated and actually formed in California upon the execution of Data Disc's acceptance.); *Wisconsin Elec. Mfg. Co., Inc. v. Pennant Products*, 619 F.2d 676, 678–79 n. 10 (7th Cir.1980) (Two visits by agents first during negotiations to determine whether the defendant could perform the agreement and a second time to resolve a later dispute, were significant in the formation and performance of the contract. The plaintiff had accepted the order in Wisconsin by mailing an acknowledgement.); *Hoster v. Monongahela Steel Corp.*, 492 F.Supp. 1249, 1253 (W.D.Okl. 1980) (The defendant initiated contract negotiations which included making fourteen separate telephone calls to the plaintiff in Oklahoma, sending an agent to negotiate in that state, and corresponding twice with the plaintiff, resulting in an agreement to sell steel reinforcing bars. The district court considered the totality of contacts that encompassed these initial negotiations and the place of entering the contract and concluded that if a foreign corporation voluntarily elects to act in the state, it should be answerable in the state.)

with the state.[6] *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957). The Supreme Court has reaffirmed the importance of the "purposefully availing" language in *Kulko v. Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978). In that case, a California judge had attempted to obtain jurisdiction over a father who acquiesced in his daughter's decision to live in California notwithstanding a separation agreement dictating otherwise. The Supreme Court held that the father did not avail himself of the protections and benefits of California's laws by acquiescing in his daughter's decision or by visiting there twice during his lifetime. *Id.* at 92–96, 98 S.Ct. at 1696–99.

The Supreme Court again addressed the question of personal jurisdiction in *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Under the facts of this case the plaintiffs, residents of New York, were injured while driving through Oklahoma enroute to their new home in Arizona. The Oklahoma courts upheld jurisdiction over the nonresident distributor and retailer on the ground that it was foreseeable that the automobile would be driven in Oklahoma. Ultimately, the Court rejected "foreseeability" as a benchmark under due process. Explaining the relevancy of foreseeability, the Court stated: "The foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being hauled into court there." *Id.* at 297, 100 S.Ct. at

567. Develop:ng further the concept of minimum contacts, the Court concluded that the concept has two interrelated functions: "It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* at 292, 100 S.Ct. at 564. To protect the defendant from inconvenient litigation, the courts must determine whether it is reasonable for the nonresident to defend the suit. Factors to be considered include the burden on the defendant, the forum state's interest in the litigation, the plaintiff's interest in relief, efficient resolution of disputes in an interstate judicial system, and the concurrent interests of the states in fundamental substantive social policies. *Id.* While *Worldwide Volkswagen* injected state sovereignty considerations into the minimum contacts standard, the Court has clarified that "the restriction on state sovereignty power [is to] be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause. That Clause is the only source of the personal jurisdictional requirement and the Clause itself makes no mention of federalism concerns." *Insurance Corp. v. Compagnie des Bauxites*, 456 U.S. 694, 703 n. 10, 102 S.Ct. 2099, 2104 n. 10, 72 L.Ed.2d 492 (1982). In this recent case, Justice White, speaking for the Court, held that the district court had obtained in personam jurisdiction over a nonresident corporation that failed to comply with discovery under Rule 37(b) of the Federal Rules of Procedure. A nonresident defendant may waive its individual

---

**6.** Land Use urges this court to adopt the criteria which the Court of Appeals for the Sixth Circuit assembled in *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir.1968). The three criteria are:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substan-

tial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* Although the Fourth Circuit has not adopted the *Mohasco* standard, some district courts have applied the criteria. *McLaughlin v. Copeland*, 435 F.Supp. 513–523 (D.Md.1977); *Piracci v. New York City Employees' Retirement System*, 321 F.Supp. 1067, 1071–73 (D.Md.1971). This court chooses not to apply these criteria but relies upon the Supreme Court precedents from which they originate.

liberty interest or may be estopped from raising the issue for failing to produce the documents sought. The Court confirmed that the Due Process Clause of the fourteenth amendment restricts judicial power as a matter of individual liberty; therefore, "the test for personal jurisdiction requires that 'that the maintenance of the suit ... not offend "traditional notions of fair play and substantial justice." ' " *Id.* at 702–03, 102 S.Ct. at 2104–05 (citations omitted). Thus, this court must determine whether the "quality and nature" of the defendant's conduct in Virginia is sufficient to reasonably require it to defend this case. *International Shoe Co. v. Washington,* 326 U.S. at 316–17, 66 S.Ct. at 158.

■ There are several key facts gleaned from the pleadings, exhibits, and affidavits which demonstrate a sufficient nexus upon which to base in personam jurisdiction. Part of the initial negotiations as well as meetings to resolve the current dispute took place in Virginia. Telephone conversations, telexes and letters traveled to and from the state, establishing an agreement which provided that one plaintiff would be the exclusive sales agent of the defendant. Moreover, once performance began, quality control tests on the coal were performed in Buchanan County, Virginia. Defendant's agent fulfilled its obligations and accomplished partial performance of the agreement from its headquarters in Bristol, Virginia. Activities necessary to assure that Land Use supplied coal to Appalachian Power Company—planning deliveries, sending shipping instructions, ascertaining prices, calculating premium penalties, and paying the defendant—happened in Virginia. Thus, in reviewing defendant's contacts with the Commonwealth in totality, it has a substantial connection with the forum state, and these transactions are part of the facts which give rise to this case. Through these various visits and business relations defendant has found a market for a portion of its coal. By selecting an exclusive sales agent in Virginia to deal with Appalachian Power Company, the corporation could anticipate being sued in the state for actions which its agent took. It also

benefits from enforcement of contracts and sales with Appalachian Power Company which its agent negotiated. Consequently, the relationship between Land Use and Virginia is sufficient to require the corporation to defend an action without offending "traditional notions of fair play and substantial justice." *See Kulko,* 436 U.S. at 91, 98 S.Ct. at 1696.

### III. Service of Process

The existence of personal jurisdiction also depends upon the defendant receiving reasonable notice that an action has been brought. *Mullane v. Central Hanover Trust Co.,* 339 U.S. at 313–14, 70 S.Ct. at 656–57. The defendant does not contest the adequacy of the notice it received (defendant's first memorandum at 29); it contends however, that there are not sufficient contacts to authorize the appointment of a statutory agent which accepted service of process. Relying on *Humphreys v. Pierce,* 512 F.Supp. 1321 (W.D.Va.1981), plaintiffs assert that since in personam jurisdiction exists, service of process is proper.

■ Rule 4(e) of the Federal Rules of Civil Procedure, as amended April 29, 1980, provides in part:

> Whenever a statute of the state in which the district court is held provides (1) for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state, ... service may ... be made under the circumstances and in the manner prescribed in the statute.

Pursuant to Rule 4(e), service on the defendant was made upon the Secretary of the Commonwealth as prescribed in Va. Code § 8.01–329. That provision states in major part:

> A. When the exercise of personal jurisdiction is authorized by this chapter, service of process or notice may be made in the same manner as is provided for in Chapter 8 (§ 8.01–285 *et seq.*) of this title in any other case in which personal jurisdiction is exercised over such a nonresident party .... or on the Secretary of

the Commonwealth of Virginia, ....
who, for this purpose, shall be deemed to
be the statutory agent of such per-
son....

Thus, if the court determines that it has in
personam jurisdiction over the defendant,
service of process may issue to the nonresi-
dent defendant by serving the Secretary.

Since the court has concluded that there
are minimum contacts sufficient to make
the nonresident corporation defend the ac-
tion without offending ideas of fairness
and justice and since the defendant does
not attack the adequacy of notice, this
court has personal jurisdiction over the de-
fendant. Likewise, there are sufficient
contacts to make service of process proper.
*See Humphreys*, 512 F.Supp. 1322.

### IV. Venue

■ The burden to establish that venue
is appropriate in this district is upon the
plaintiffs once defendant raises an objec-
tion. *Bartholomew v. Virginia Chiro-
practors Ass'n.*, 612 F.2d at 816; *Hodson
v. A.H. Robins Co., Inc.*, 528 F.Supp. 809,
812 (E.D.Va.1981). *See* 15 Wright, Miller
& Cooper, *Federal Practice and Proce-
dure* § 3826 at 168 (1976 & Supp.1982).
Plaintiffs assert that venue is proper under
28 U.S.C. § 1391(a), which states that:

> (a) A civil action wherein jurisdiction is
> founded only on diversity of citizenship
> may, except as otherwise provided by
> law, be brought only in the judicial dis-
> trict where all plaintiffs or all defendants
> reside, or in which the claim arose.

A corporate defendant is a resident of a
particular judicial district for venue pur-
poses if that company is incorporated, li-
censed to do business, or is doing business
in that district. 28 U.S.C. § 1391(c). From
the pleadings, affidavits and exhibits, the
court has determined that United Coal is
incorporated in Virginia, and Harbour Ma-
rine is incorporated in Ohio. While the
latter may conduct some business in West
Virginia, no allegations are made that it is
licensed to do business or is doing business
in Virginia. Thus, venue is not based on
the district "where all plaintiffs reside,"
because both plaintiffs do not reside in the
same district. Since the defendant is a
resident of West Virginia and asserts that
it is not licensed to do business and it does
not conduct business in Virginia, the
second option for venue is inapplicable.
The only relevant test for venue is where
"the claim arose."

To determine where the claim arose, the
court turns to the legislative history. Con-
gress added the third venue option in 1966
with the explicit purpose of closing the
venue gap created by actions brought by
multiple parties. The meager history indi-
cates that the enlargement of venue au-
thority would facilitate the disposition of
contract and tort claims by providing a
more convenient forum to the litigants and
the witnesses. S.Rep. No. 1752, 89th
Cong., 2d Sess., *reprinted in* 1966 U.S.
Code Cong. & Ad.News 3693, 3694; *Bru-
nette Machine Works, Ltd. v. Kockum In-
dustries, Inc.*, 406 U.S. 706, 710 n. 8, 92
S.Ct. 1936, 1939 n. 8, 32 L.Ed.2d 428 (1972).

Since the legislative history provides lit-
tle guidance, the court examines the case
law interpreting the clause. Plaintiffs
urge the court to adopt the identity ap-
proach. Under that test, if a defendant is
subject to jurisdiction under a state's long-
arm statute which extends jurisdiction to
the outer limits of due process, then the
claim necessarily arises in that district.
*OCE Industries, Inc. v. Coleman*, 487
F.Supp. 548, 552 (W.D.Ill.1980). *See also
Bastille Properties, Inc. v. Hometels of
America, Inc.*, 476 F.Supp. 175, 178–82
(S.D.N.Y.1979). One commentator advo-
cates the equation of the availability of
process over a nonresident and proper ven-
ue under § 1391(a) for the following rea-
sons:

> First it would minimize the number of
> instances in which plaintiff is put to the
> election of foregoing protections afford-
> ed him by a state with sufficient connec-
> tion with the subject matter to justify it
> in exercising compulsory jurisdiction
> over the defendant, or shifting the choice
> of a state or federal forum to the defend-
> ant. Second, in cases in which the de-
> fendant is sued in an inconvenient forum

it would broaden the choices available under § 1404(a) as interpreted in *Hoffman v. Blaski*, 363 U.S. 335 [80 S.Ct. 1084, 4 L.Ed.2d 1254] (1960). Third, it would shift the issue in motions for transfer from the largely technical questions of which fact of perhaps many that underlie a claim marks the place at which the claim arose toward the considerations of convenience that underlie the venue concept.

1 J. Moore, *Moore's Federal Practice* § 0.142[5.–2] at 1430 (1983) (citations omitted). The commentator notes that using a minimum contacts interpretation for venue poses two potential problems. First, the use of contacts to justify extraterritorial process would determine venue in § 1391(a) and (b); yet the situation is reversed in § 1391(e) providing that a civil action in which the United States or any agency is a defendant may be brought in a judicial district where the cause of action arose. Second, federal venue is assigned to judicial districts, not to states. *Id.* at 1432. A more fundamental problem is the court's ability to bootstrap into venue once it finds in personam jurisdiction, thereby defeating the purpose of the federal venue statutes. *See NTN Bearing Corp. v. Charles E. Scott, Inc.*, 557 F.Supp. 1273, 1277 (N.D.Ill. 1983).

 Another criticism of the identity approach is the confusion of standards applied to personal jurisdiction and venue. Although the court did not expressly mention the principles of comity and federalism in *Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), Justice Stevens reiterated that the ideas of personal jurisdiction and venue are two separate concepts: Personal jurisdiction "goes to the court's power to exercise control over the parties" whereas venue is "primarily a matter of choosing a convenient forum." *Id.* at 180, 99 S.Ct. at 2715. *See Olberding v. Illinois Central R. Co.*, 346 U.S. 338, 340, 74 S.Ct. 83, 85, 98 L.Ed. 39 (1953) (applying 28 U.S.C. § 1391(a) prior to the 1966 amendment); Case Comment, *Venue: Leroy v. Great Western United Corp.*, 31 S.C.L.Rev. 579, 596

(1980). In other words, "jurisdictional rules tell us where a party may be sued, while venue rules tell us where such suit ought to be conducted." *NTN Bearing Corp.*, 557 F.Supp. at 1277. It is well settled that "the determination of where 'the claim arose' for purposes of federal venue under § 1391 is a federal question whose answer depends on federal law." *Leroy*, 443 U.S. at 183 n. 15, 99 S.Ct. at 2716 n. 15. *See generally* 15 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3803 at 10–13. Personal jurisdiction in diversity cases, on the other hand, is determined under the state's long-arm statute. The purposes and protections of each concept are unique. Long-arm statutes protect plaintiffs by permitting them to bring nonresident defendants into court; a defendant who seeks the protections of a state's law must accept responsibility for defending suits brought under that law. *Honda Associates, Inc. v. Nozawa Trading, Inc.*, 374 F.Supp. 886, 889 (S.D.N.Y. 1974). As noted above, the concept "protects the defendant against the burdens of litigating in a distant or inconvenient forum." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 291–92, 100 S.Ct. at 564. The Court has concluded that the purpose of the venue statutes, in most instances, is "to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Leroy*, 443 U.S. at 184, 99 S.Ct. at 2716. (emphasis in original). While several contacts which establish *in personam* jurisdiction may be considered for a determination of venue, this court rejects the identity approach.

The defendant suggests several tests to determine where a claim arises for purposes of venue: (1) the place of injury rule; (2) the weight of contacts rule; and (3) the substantial events rule. *Cochrane v. Iowa Beef Processors, Inc.*, 596 F.2d 254, 260–61 (8th Cir.1979), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Hodson v. A.H. Robins Co., Inc.*, 528 F.Supp. at 813. *See* 15 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3806;

*Annot.,* 59 ALR Fed. 320 (1982 & Supp. 1983). Defendant contends, however, that based on any of these tests, venue may not properly be brought in this district.

Since the United States Court of Appeals for the Fourth Circuit has not enunciated a test to determine where a claim arises, this court examines the recent case of *Leroy* for a standard. In that case, Great Western, a Delaware corporation with its headquarters in Texas, made a public offer to purchase some stock of Sunshine, a company organized under the laws of Washington with assets and offices in Idaho. Sunshine also conducted business in New York and Maryland. Great Western filed a declaratory judgment action against officials of Idaho, New York, and Maryland in the United States District Court for the Northern District of Texas, seeking to invalidate the takeover laws of the respective states. The Idaho defendants appeared specially to object to jurisdiction and venue. The Court ultimately decided that the claim against the Idaho defendants arose in Idaho and that venue did not lie in the Northern District of Texas. 443 U.S. at 185–87, 99 S.Ct. at 2717–18.

The Court adopted an approach of analyzing the contacts between the claim and judicial districts. The analysis was based upon three critical contacts: The action taken in Idaho by Idaho residents; the bulk of relevant evidence and witnesses; and the nature of the challenge to the Idaho statute. These factors connected the claim and the Idaho District Court so that the defendant had a convenient forum. The Court rejected the decision of the Fifth Circuit Court of Appeals. The appellate court had held that the claim arose in Texas because Great Western initiated the tender offer there and because the impact of the Idaho officials would be felt there. In the Court's opinion, this reasoning failed to sufficiently connect the claim and the Northern District of Texas, and it exposed the Idaho officials to suits in almost every district in the country. *Id.* This Supreme Court ruling dealt with the language of where "the claim arose" in § 1391(b), the provision governing venue when jurisdic-

tion is not based on diversity. If the intent of Congress is to close the venue gap, then the interpretation of where the claim arose also must be adopted for § 1391(a). *Hodson,* 528 F.Supp. at 812.

Apparently, the Court applied a weight of contacts analysis in *Leroy.* This rule first appeared in *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 291 F.Supp. 252 (E.D.Pa.1968). In the antitrust case, the plaintiffs contended that their claims arose under § 1391(b) in any district where sales were made at the inflated prices that the conspiracy caused. The court refused to accept this reasoning. Instead, the district judge determined that where the claim arose should depend upon "where the contacts weigh most heavily." 291 F.Supp. at 260. Venue will lie in a district where defendants made significant sales inflicting substantial injury but is improper in a district in which one insignificant sale occurred. Ultimately, the court concluded that venue was appropriate in the district where the alleged conspiracy had occurred.

Somewhat similar to the weight of contacts test, the American Law Institute's proposal allows venue in any district where "a substantial part of the events or omissions giving rise to the claim occurred." ALI Study of the Division of Jurisdiction Between the State and Federal Courts §§ 1303, 1314 (1969). The drafters apparently sought to enact the weight of contacts test with some improvements. The standard first permits venue in *any* district instead of *the* district, which insures that venue could be proper in more than one district. Secondly, the burden is upon the plaintiff to show that a substantial part of the events arose in the district. Several courts have adopted the ALI substantial events test or a test akin to it. *See Lamont v. Haig,* 590 F.2d 1124, 1134 (D.C.Cir. 1978); *Commercial Lighting Products, Inc. v. United States District Court,* 537 F.2d 1078, 1080 (9th Cir.1976). The Eighth Circuit Court of Appeals has applied the test along with other tests. *See In re Nine Mile, Ltd.,* 692 F.2d 56, 60 (8th Cir.1982)

(applying substantial part of events test), citing *Cochrane v. Iowa Beef Processors, Inc.*, 596 F.2d at 261 (applying the ALI test in addition to the weight of contacts test and the place of injury test); *Gardner Engineering Corp. v. Page Engineering Co.*, 484 F.2d 27, 33 (8th Cir.1973) ("noting" but not necessarily applying the ALI test). Courts have been perplexed in their efforts to develop an acceptable test, *see* e.g., *Pfeiffer v. Intern Acad. of Biomagnetic Medicine*, 521 F.Supp. 1331, 1340 (W.D.Mo. 1981), and the Supreme Court gave little specific guidance in *Leroy*. As one commentator noted, the substantial events test is "intended to narrow potential venues to those with a rational relation to the claim" and minimize the *ad hoc* balancing of each case. 31 S.C.L.Rev. at 594. The Court has left the refinement of the weight of contacts rule to lower federal courts.

 This court applies a substantial contacts test to determine whether venue is proper in this judicial district. A review of the facts shows that the defendant visited Virginia to negotiate the initial contract and the current dispute. Consequently, witnesses and documentary evidence would be found in this district. Likewise, the exclusive sales agent, United Coal Company, has its residence here, and presumably, many of its employees live nearby. Thus, this district is convenient for the defendant because several relevant documents and witnesses are located here.[7] In ascertaining whether there is another judicial district which is more convenient for the defendant and which has a closer connection with the claim, the court reviews the contacts with the Southern District of West Virginia. The activities of the West Virginia resident in its home state are considered first. From September 1981 to August 1982, the West Virginia corporation has mined coal and shipped it out of the state from the mine to Harbour Marine. Furthermore, any future sales under the contract would result in the defendant ship-

ping West Virginia coal to Harbour Marine, and the parties do not allege that the coal ever enters the Commonwealth of Virginia. Considering the location of witnesses and relevant evidence, the court concludes that some of the witnesses are residents of West Virginia and that a portion of the documentary evidence would be at the defendant's corporate headquarters in Summersville. It is more convenient for the defendant to adjudicate the case in its "home district."

Finally, the court turns to the nature of the suit. This case is a declaratory judgment action to determine what the terms of the contract are and to seek enforcement of it. The letter agreement was partially negotiated in Bristol, and finally drafted there. Chilcot signed it for United Coal before sending it to Bright in West Virginia. When Bright formally signed the document, Land Use Corporation became bound. Since the parties did not include a choice-of-laws provision, general conflict of laws rules apply. Under the principle established in *Erie* a federal court exercising diversity jurisdiction must apply the conflict of laws rule of the forum state. *Erie Railroad Co. v. Thompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Kline v. Wheels by Kinney, Inc.*, 464 F.2d 184 (4th Cir.1972); *White v. American Motor Sales Corp.*, 550 F.Supp. 1287, 1289 (W.D.Va. 1982). The Supreme Court of Virginia specifically rejected the Restatement (Second) of Conflict of Laws approach to conflicts question and retained the traditional conflict of laws rules. *McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662 (1979). Under the traditional approach, the place of contracting governs. *National Independent Coal Operators Ass'n., Inc. v. Old Republic Ins. Co.*, 544 F.Supp. 520 (W.D.Va.1982); *Wellmore Coal Corp. v. Gates Learjet Corp.*, 475 F.Supp. 1140, 1143 (W.D.Va. 1979), citing *Woodson v. Celina Mut. Ins. Co.*, 211 Va. 423, 426, 177 S.E.2d 610, 613 (1970). The place of contracting has been interpreted as the place where the last

---

7. This statement is premised upon the assumption that defendant would elicit testimony directly or through depositions from plaintiffs' employees if the plaintiffs chose not to call some of the individuals involved in the negotiations of the agreement.

**1162**

event which is necessary to give the contract validity takes place. *Wellmore Coal Corp. v. Gates Learjet Corp.*, 475 F.Supp. at 1144; *Brand Distributors, Inc. v. Insurance Co. of North America*, 400 F.Supp. 1085, 1088 (E.D.Va.1974), *rev'd on other grounds*, 532 F.2d 352 (4th Cir.1976), citing *Woodson v. Celina Mutual Ins. Co.*, 211 Va. 423, 426, 177 S.E.2d 610, 613 (1970). (*Lex loci contractus* governs the nature, construction, and validity of the contract). While this court can interpret and apply the law of West Virginia to this contract, the application of West Virginia law is another factor considered in the determination of venue. Thus, this court concludes that substantial events happened in the Southern District of West Virginia which outweigh the contacts with this district. Venue is not proper in this district.

Finding venue is improper, the court is empowered either to "dismiss, or if it be in the interest of justice, transfer such case to any district or division where it could have been brought." 28 U.S.C. § 1406(a). Generally courts will transfer such cases when it is clear where proper venue would lie. In this case, venue is proper in the Southern District of West Virginia where the residence of the defendant is located and where a substantial part of the events happened.

## V. CONCLUSION

The defendant's motions to dismiss for lack of personal jurisdiction, for improper venue, and for insufficiency of process are denied. Having found that venue is not proper in this district, this case is ORDERED transferred to the Southern District of West Virginia.