**PUBLISHED**

# UNITED STATES COURT OF APPEALS

### FOR THE FOURTH CIRCUIT

SEABULK OFFSHORE, LIMITED,
            *Plaintiff-Appellant,*

v.

AMERICAN HOME ASSURANCE
COMPANY,
            *Defendant-Appellee,*

and

DYN MARINE SERVICES,
INCORPORATED,
            *Defendant.*

No. 03-1320

SEABULK OFFSHORE, LIMITED,
            *Plaintiff-Appellant,*

v.

DYN MARINE SERVICES,
INCORPORATED,
            *Defendant-Appellee,*

and

AMERICAN HOME ASSURANCE
COMPANY,
            *Defendant.*

No. 03-2087

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, District Judge.
(CA-02-777-A)

Argued: February 26, 2004

Decided: July 28, 2004

Before WILKINSON and KING, Circuit Judges, and
William D. QUARLES, Jr., United States District Judge
for the District of Maryland, sitting by designation.

---

Reversed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Wilkinson and Judge Quarles joined.

---

## COUNSEL

**ARGUED:** Thomas Owen Mason, WILLIAMS, MULLEN, CLARK & DOBBINS, McLean, Virginia, for Appellant. Robert N. Kelly, JACKSON & CAMPBELL, P.C., Washington, D.C., for American Home Assurance Company; Caroline Turner English, ARENT, FOX, KINTER, PLOTKIN & KAHN, P.L.L.C., Washington, D.C., for Dyn Marine Services, Incorporated. **ON BRIEF:** Rachel L. Semanchik, WILLIAMS, MULLEN, CLARK & DOBBINS, McLean, Virginia, for Appellant. Barbara M. R. Marvin, JACKSON & CAMPBELL, P.C., Washington, D.C., for American Home Assurance Company; Howard V. Sinclair, J. Marcus Meeks, ARENT, FOX, KINTER, PLOTKIN & KAHN, P.L.L.C., Washington, D.C., for Dyn Marine Services, Incorporated.

---

## OPINION

KING, Circuit Judge:

This appeal stems from an insurance coverage dispute rooted in a maritime accident. Plaintiff Seabulk Offshore, Limited ("Seabulk") appeals from rulings made in the Eastern District of Virginia in favor of defendant American Home Assurance Company ("American Home") and defendant Dyn Marine Services, Incorporated ("Dyn Marine"). Seabulk initially filed suit in 2002 in the Southern District of Texas, seeking a declaratory judgment and damages. The Texas proceeding was thereafter transferred to the Eastern District of Vir-

ginia, where Seabulk filed an amended complaint (the operative complaint in this proceeding). By its lawsuit, Seabulk sought a declaration that it was entitled to insurance coverage by American Home for a lawsuit then pending against it in Texas; in the alternative, Seabulk sought damages from Dyn Marine for breach of contract and for fraud. In seeking declaratory relief, Seabulk alleged that it was covered under an insurance policy issued by American Home. Seabulk's breach of contract and fraud claims sought damages arising from a related agreement between Seabulk and Dyn Marine. Dyn Marine counterclaimed against Seabulk for breach of contract, and it cross-claimed against American Home, also seeking insurance coverage for the Texas lawsuit.

On January 28, 2003, the district court ruled that Seabulk was not entitled to either insurance coverage or damages, it awarded summary judgment to American Home and Dyn Marine, and it dismissed Dyn Marine's cross-claim against American Home. *Seabulk Offshore, Ltd. v. Dyn Marine Servs., Inc.*, Nos. 66 and 67 Civ. 02-777-A (E.D. Va. Jan. 28, 2003) (the "January Opinion"). The court thereafter awarded summary judgment to Dyn Marine, in the sum of more than $400,000, on its counterclaim against Seabulk. *Seabulk Offshore, Ltd. v. Dyn Marine Servs., Inc.*, Nos. 84 and 85 Civ. 02-777-A (E.D. Va. Jul. 30, 2003) (the "July Opinion"). Seabulk has appealed, maintaining that the court erred in its rulings.[1] As explained below, the insurance policy affords coverage to Seabulk, and we therefore reverse the award of summary judgment in favor of American Home and vacate the balance of the January Opinion. Because the July Opinion was filed without the benefit of this decision, we also vacate and remand that Opinion.

---

[1]On February 26, 2003, Seabulk filed a notice of appeal from the January Opinion. On August 28, 2003, it filed a separate notice of appeal from the July Opinion. The notice of appeal of February 26, 2003, was premature in that it sought review of an interlocutory decision. *See* 28 U.S.C. § 1291 (establishing that courts of appeals "shall have jurisdiction of appeals from all final decisions of the district courts"). Our jurisdiction stems from the notice of appeal of August 28, 2003, which was from the district court's final decision, i.e., the July Opinion.

I.

A.

Seabulk is a limited partnership headquartered in Florida; it owns and operates offshore commercial shipping vessels.[2] Dyn Marine, a subsidiary of DynCorp, is a California corporation with its principal place of business in Virginia; part of its business is to supply crews to operate offshore commercial shipping vessels. American Home maintains its principal place of business in New York, and it is engaged in the insurance business.

On February 6, 2001, following more than a month of negotiations, Seabulk and Dyn Marine entered into a "Manning Agreement" (the "Agreement"), providing that Dyn Marine would supply crews to operate two Seabulk commercial shipping vessels, the *Seabulk New Hampshire* and the *Seabulk Kentucky*.[3] Exhaustive in its scope, the Agreement is comprised of thirteen Articles governing various aspects of the relationship between Seabulk and Dyn Marine. Most pertinent here is Article VIII, entitled "Insurance," which spells out the parties' obligations to procure and maintain insurance coverage.

Section 8.1 of the Agreement provides, inter alia, that Dyn Marine would secure and maintain a policy of commercial general liability insurance ("CGL insurance" or "CGL coverage"), affording coverage for Bodily Injury and Property Damage.[4] Agreement § 8.1. The CGL

---

[2]The relevant facts in this appeal are largely undisputed. They are set forth in this Part I as follows: subpart I.A examines the relationship between Seabulk and Dyn Marine, detailing the relevant aspects of their contract; subpart I.B enumerates the pertinent provisions of the insurance policy; subpart I.C describes the underlying maritime accident and the Texas litigation that arose therefrom; and subpart I.D spells out the procedural history of this dispute.

[3]The effective date of the Agreement is designated as "TBD," presumably meaning "To Be Determined." Agreement § 6.1; *id.* at Ex. A. The parties concede that, for purposes of this appeal, the one year Agreement was in effect at all times relevant to these proceedings.

[4]CGL insurance normally provides coverage for the general liabilities of businesses, including "damages that the insured becomes legally obligated to pay to a third party because of bodily injury or property damage." *Black's Law Dictionary* 646 (abridged 7th ed. 2000); *see also* Robert H. Jerry, II, *Understanding Insurance Law* § 65[a] (2d ed. 1996).

coverage required by the Agreement was to be broader than typical CGL coverage, however, in that it was to provide "*in rem* coverage," plus coverage for "contractual liability" and "completed operations."[5] *Id.* Seabulk and Dyn Marine agreed that the CGL insurance would have "[m]inimum limits of $5,000,000 per occurrence" with "no annual aggregate." *Id.* Dyn Marine was to name Seabulk as an additional insured, with the CGL coverage being primary to any other applicable coverage. *Id.* Finally, Seabulk and Dyn Marine agreed that Dyn Marine's insurer was to waive its rights of subrogation against Seabulk. *Id.*

Pursuant to section 8.2(a), Seabulk agreed, for its part, to procure and maintain full protection and indemnity insurance ("P&I insurance" or "P&I coverage") on the *Seabulk New Hampshire* and the

---

[5]Section 8.1 of the Agreement provides in pertinent part as follows:

Manager [Dyn Marine] shall procure and maintain with respect to and for the duration of this Agreement . . . :

. . .

(b) Commercial General Liability Insurance: Coverage for Bodily Injury and Property Damage, including contractual liability, completed operations and *in rem* coverage. Minimum limits of $5,000,000 per occurrence, no annual aggregate.

. . .

Deductible amounts for [Dyn Marine's] insurance will be the responsibility of [Dyn Marine]. With regard to all [Dyn Marine's] Insurance policies, [Dyn Marine] shall ensure the following:

1. [Dyn Marine's] insurance coverage shall be primary to any other applicable insurance coverage.

2. [Seabulk] shall be named an Additional Insured.

3. Insurers shall waive rights of subrogation against [Seabulk].

. . .

6. All [Dyn Marine's] insurance policies shall include a severability of interest or cross-liability endorsement.

Agreement § 8.1.

*Seabulk Kentucky*.[6] Agreement § 8.2(a). The P&I insurance was to provide coverage, inter alia, for "maintenance, cure and unearned wages" with respect to the Dyn Marine crews.[7] *Id.* And Seabulk agreed to name Dyn Marine as "a co-insured with a waiver of subrogation," with the P&I coverage having "a minimum [policy] limit of $25,000,000 per occurrence." *Id.*

B.

During the relevant period, Dyn Marine maintained CGL coverage through an insurance policy issued to DynCorp in Virginia by American Home, specifically Policy No. RM GL 612-38-16, effective from July 1, 2000, through July 1, 2001 (the "Policy"). The Policy provided coverage to DynCorp and thirty-four of its subsidiaries, including Dyn Marine, which are named as insureds in the Policy's "Broad Named Insured Endorsement." In this Endorsement, Dyn Marine is designated with an asterisk, indicating by footnote that the Policy functions, with respect to Dyn Marine, "To Cover US Office Exposures *Only*" (the "Exposures Footnote").[8]

---

[6]P&I insurance typically involves "coverage for occurrences such as personal injury or death of crew members, stevedores, passengers and others; damage or loss to cargo; collision liabilities excluded by hull insurance; pollution; wreck removal; certain salvage expenses; fines and penalties; and costs of defense." *Benedict on Admiralty* § 12.11 (Release No. 92, Dec. 2003).

[7]Section 8.2(a) of the Agreement provides in pertinent part as follows:

> Protection and Indemnity: With respect to [the *Seabulk New Hampshire* and the *Seabulk Kentucky*] Owner [Seabulk] will maintain full Protection and Indemnity Insurance with a member of the International Group of P&I Clubs or P&I insurance with a mutually acceptable insurer in the standard insurance market. This includes but is not limited to coverage for maintenance, cure and unearned wages in respect of [Dyn Marine's] crewmembers, with a minimum limit of $25,000,000 per occurrence. Owner's P&I insurance shall name [Dyn Marine] as a co-insured with a waiver of subrogation. Deductibles and any self-insured retentions shall be for Owner's account.

Agreement § 8.2(a).

[8]The Broad Named Insured Endorsement provides in pertinent part as follows:

The Policy obligates American Home to pay to Dyn Marine those sums that Dyn Marine becomes legally obligated to pay as damages because of bodily injury or property damage for covered occurrences while the Policy is in effect.[9] Policy § I. It vests in American Home "the right and duty to defend any 'suit'" seeking such damages, and it recognizes that American Home may, at its discretion, "investigate any 'occurrence' and settle any [resulting] claim or 'suit.'" *Id.* In its Section IV, the Policy contains a "Separation of Insureds" clause, declaring that its CGL coverage applies "[a]s if each Named Insured were the only Named Insured," and "[s]eparately to each insured against whom [a] claim is made or [a] 'suit' is brought." Policy § IV(7).

In addition, the Policy bears four other Endorsements that are pertinent to this appeal:

- *Endorsement #4 (the "Coverage Territory Endorsement")*: This Endorsement amends the Policy's coverage territory "to include the Gulf of Mexico and other areas up to [sic] including 100 miles offshore."

- *Endorsement #9 (the "Watercraft Endorsement")*: This Endorsement deletes "all watercraft exclusions . . . in their entirety." Absent the deletion of the watercraft exclusions, the Policy would not provide coverage for bodily injury or property damage "arising out of the

---

It is understood and agreed that the following are to be added as named insured:

. . .

Dyn Marine Services, Inc.*

. . .

**\*To Cover US Office Exposures *Only***

Policy at Broad Named Insured Endorsement.

[9]The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Policy § V(9).

ownership, maintenance, use or entrustment to others of any . . . watercraft owned or operated by or rented or loaned to any insured." Policy § I(2)(g).

- *Maritime Liability Endorsement In Rem Coverage (the "In Rem Endorsement")*: This Endorsement modifies the Policy's "Section II — Who Is An Insured" to provide that "*In Rem* actions against any watercraft owned or operated by . . . any insured will in all respects be treated in the same manner as though the action were *In Personam* against that insured."

- *Additional Insured — Where Required Under Contract or Agreement Endorsement (the "Additional Insured Endorsement")*: This Endorsement amends Section II of the Policy to add as an additional insured any organization that Dyn Marine becomes obligated to include as an insured under a contract requiring Dyn Marine to furnish insurance of the type provided by the Policy.[10] Such an organization benefits from the Additional Insured Endorsement "only with respect to liability arising out of . . . operations or premises owned by or rented to [Dyn Marine or another named DynCorp subsidiary]." An additional insured falling within this Endorsement's purview is entitled to coverage that does not exceed the lesser of (1) the coverage and/or limits of the Policy, or (2) the coverage and/or limits required by contract.

---

[10]The Additional Insured Endorsement, in pertinent part, defines an additional insured as:

> [a]ny . . . organization to whom you [Dyn Marine or another named DynCorp subsidiary] become obligated to include as an additional insured under this policy, as a result of any . . . agreement you enter into which requires you to furnish insurance to that . . . organization *of the type provided by this policy*.

Policy at Additional Insured Endorsement (emphasis added).

C.

On March 25, 2001, while the Agreement and the Policy were in effect, the *Seabulk New Hampshire*, manned by a Dyn Marine crew, collided in Louisiana's Amelia Channel with a barge being towed by the vessels *Miss Debbie* and *Miss Sue* (the "Accident"). Two *Miss Debbie* crewmen thereafter filed a personal injury lawsuit against Seabulk in the Southern District of Texas. *See Simon v. Odyssea Vessels, Inc.*, Civ. A. No. G-01-187 (S.D. Tex. 2001) (the "Texas Litigation"). Seabulk then filed a third-party complaint against Dyn Marine in the Texas Litigation, alleging that the negligence of Dyn Marine's crew proximately caused the Accident. Throughout the Texas Litigation, Seabulk demanded coverage from American Home by way of indemnification and defense, asserting that the Policy afforded it liability coverage as a result of the Additional Insured Endorsement. American Home denied Seabulk's demand, contending that any coverage provided to Seabulk under the Policy could be no greater than that provided to Dyn Marine. According to American Home, Dyn Marine's coverage was limited by the Exposures Footnote, and thus Seabulk's coverage was correspondingly limited. American Home maintained that the Footnote's qualifying language, "To Cover US Office Exposures *Only*," limited the Policy's coverage to land-based, United States office occurrences, thus precluding coverage for maritime liabilities.

In May of 2002, Seabulk, Dyn Marine, and the *Miss Debbie* plaintiffs settled the Texas Litigation for the sum of $780,000, with Seabulk and Dyn Marine each contributing $390,000 to the settlement. Seabulk, pursuant to the Agreement, had procured and maintained P&I coverage, and the P&I insurer indemnified Seabulk for the sum it paid to settle the Texas Litigation. Subsequent to the settlement, a *Miss Sue* crew member filed a personal injury suit against Seabulk in the District of Louisiana (the "Louisiana Litigation"). Seabulk demanded indemnification and defense from American Home and damages from Dyn Marine, which were denied. Seabulk then settled the Louisiana Litigation, with the P&I insurer contributing the settlement funds.[11]

---

[11]Seabulk's costs of defense in the Louisiana Litigation are not at issue in this appeal.

D.

On March 13, 2002, during the pendency of the Texas Litigation, Seabulk filed this lawsuit in Texas against American Home and Dyn Marine. As noted above, Seabulk sought a declaration that it was entitled to CGL coverage pursuant to the Policy and that American Home was obligated to indemnify and defend Seabulk in the Texas Litigation, subject to the limits of the Policy. In the alternative, Seabulk sought damages for breach of contract and for fraud, alleging that Dyn Marine had breached the Agreement by failing to provide Seabulk with CGL coverage and a competent crew, and that Dyn Marine had fraudulently misrepresented its intentions during negotiations for the Agreement. On April 25, 2002, Dyn Marine sought to dismiss Seabulk's complaint for improper venue, or, alternatively, to transfer the litigation to Virginia. On May 21, 2002, the proceeding was transferred to the Eastern District of Virginia.

On June 25, 2002, Dyn Marine filed a counterclaim against Seabulk, alleging that Seabulk had breached the Agreement by failing to procure and maintain P&I coverage for Dyn Marine's damages in the Texas Litigation. On July 16, 2002, Dyn Marine cross-claimed against American Home, seeking a declaration that, if Seabulk's damages in the Texas Litigation were covered by the Policy, then Dyn Marine's damages were also covered.

Thereafter, Seabulk sought summary judgment against American Home and Dyn Marine on three grounds. First, Seabulk maintained that the Policy provisions were clear and unambiguous, entitling it to coverage by American Home in the Texas Litigation. Specifically, Seabulk asserted:

- The Policy provides CGL coverage for the Accident because it covers bodily injuries to third parties, risks associated with the ownership, use or entrustment of watercraft, and risks occurring 100 miles into the Gulf of Mexico.

- The Policy affords Seabulk CGL coverage under the Additional Insured Endorsement, which extends Seabulk coverage on the basis of the Agreement.

- Even if the Exposures Footnote of the Policy limits Dyn Marine's coverage to land-based occurrences, it does not similarly limit Seabulk's coverage. Seabulk derives its coverage from the Additional Insured Endorsement, which extends additional insureds the coverage *provided by the Policy*, and which does not premise the extent of such coverage on that of a named insured (in these circumstances, Dyn Marine).

- The Exposures Footnote of the Policy limits coverage not to land-based operations, but rather to operations based out of Dyn Marine's United States offices, as opposed to overseas offices.

Second, Seabulk contended that, if the Policy did not afford it coverage, then Dyn Marine had breached the Agreement. Specifically, Seabulk maintained that:

- The Agreement required Dyn Marine to provide CGL coverage, which would be primary to any other applicable coverage, and which would insure situations like the Accident and the Texas Litigation, i.e., damages stemming from bodily injury to third parties from *in rem* maritime risks.

- Article VIII of the Agreement, assessed in its entirety, illustrates that Seabulk agreed to a limited insurance obligation; it was to procure and maintain P&I coverage only with respect to Dyn Marine's crew. Dyn Marine, however, agreed to a broad insurance obligation; it was to secure CGL coverage for damages for bodily injury or property damage stemming from *in rem* maritime risks, i.e., situations like the Accident and the Texas Litigation.

Third, Seabulk sought summary judgment on the alternative ground that Dyn Marine had fraudulently misrepresented its intentions during the negotiations on the Agreement. Seabulk alleged that Dyn Marine had represented that the CGL coverage would extend to bodily injury and property damage resulting from the operation of the *Seabulk New Hampshire* and the *Seabulk Kentucky*. After the Acci-

dent occurred, according to Seabulk, Dyn Marine reneged on those representations, denying that it was obligated to provide Seabulk with CGL coverage. Seabulk thus asserted that it had been fraudulently induced to enter into the Agreement.

American Home also moved for summary judgment against Seabulk and Dyn Marine, seeking a declaration that it was not obligated by the Policy to indemnify or defend Seabulk or Dyn Marine. Specifically, American Home maintained that Dyn Marine's coverage under the Policy was limited by the Exposures Footnote. American Home contended that the Exposures Footnote limited Dyn Marine's coverage under the Policy to "something less" than full CGL coverage; more specifically, that it was limited to occurrences within "United States offices" (ostensibly, land-based occurrences, not maritime occurrences).

American Home explained that, although Seabulk was an additional insured under the Policy by virtue of the Agreement, Seabulk obtained its coverage through Dyn Marine. American Home maintained that such coverage could be no greater than Dyn Marine's coverage. Accordingly, because Dyn Marine was not entitled to coverage for the Texas Litigation by virtue of the Exposures Footnote, Seabulk also lacked coverage. Furthermore, American Home contended that it was not obligated to indemnify Seabulk for its damages because Seabulk had been reimbursed by its P&I insurer for the settlement of the Texas Litigation.

Finally, Dyn Marine sought summary judgment on Seabulk's breach of contract and fraud claims, asserting three bases for relief. First, Dyn Marine contended that the Agreement did not require it to provide Seabulk with coverage for maritime risks because Dyn Marine was only obligated to procure and maintain CGL coverage, which traditionally covers land-based occurrences only. Furthermore, Dyn Marine asserted, the Agreement required Seabulk to procure and maintain P&I coverage, which was specifically intended to cover maritime risks. Accordingly, Dyn Marine urged the court to consider parol evidence (the evidence of insurance experts and risk managers) on the definitions of "CGL insurance" and "P&I insurance," in that those terms were not defined in the Agreement. Dyn Marine maintained that such parol evidence would reveal that the CGL insurance

did not provide coverage for Seabulk's damages in the Texas Litigation. Second, Dyn Marine contended that, even if it had breached the Agreement, Seabulk had suffered no damages or, at most, was limited to recovering the amount of its deductible only, in that Seabulk's P&I insurer had reimbursed it for the costs of investigation, its attorneys' fees, and the settlement of the Texas Litigation. Third, Dyn Marine asserted that it was entitled to summary judgment because Seabulk could point to no facts in support of its claim that Dyn Marine committed fraud or misrepresented its intentions during the negotiations on the Agreement.

By its January Opinion, the district court (1) denied Seabulk's motion for summary judgment against American Home and Dyn Marine, (2) granted American Home summary judgment against Seabulk, (3) granted Dyn Marine summary judgment against Seabulk, (4) dismissed Dyn Marine's cross-claim against American Home, and (5) deferred ruling on Dyn Marine's counterclaim against Seabulk. In its analysis, the court first examined the dispute between Seabulk and American Home, assessing the pertinent provisions of the Policy. The court characterized the dispute as hinging upon two issues: first, "whether the language limiting Dyn Marine's coverage to U.S. office exposures preclude[d] coverage for damages arising out of the [Accident]," and second, "whether that limiting language also applie[d] to Seabulk." January Opinion at 6-7.

In addressing the first issue, the court rejected Seabulk's assertion that the Exposures Footnote referred not to land-based operations, but rather to operations based out of Dyn Marine's United States offices, as opposed to overseas offices. Because Dyn Marine did not have international offices, the court concluded that interpreting the Exposures Footnote "as excluding overseas operations would effectively read the coverage limitation out of the policy." *Id.* at 7. Recognizing that it was required to interpret the Policy provisions so as to give effect to each clause, the court concluded that "To Cover US Office Exposures *Only*" was "better read as limiting coverage to incidents that result from operations within Dyn Marine's offices on land." *Id.* at 8.

Turning to the second issue, the court addressed Seabulk's contention that even if the Policy limited Dyn Marine's coverage to injuries

caused by land-based occurrences, such limitation did not apply to Seabulk's coverage because the Additional Insured Endorsement did not refer to the Exposures Footnote limitation. Rejecting this contention, the court determined that the Additional Insured Endorsement could not extend Seabulk greater coverage than that enjoyed by Dyn Marine. *Id.* at 9. In support of its conclusion, the court noted that, "[w]here an insurer extends coverage to a party through a Named Insured, the insurer would be unlikely to intend such coverage to be greater than that it provides to the Named Insured." *Id.* The court explained that, "[i]f the scope of coverage were not subject to the same limitations as the coverage provided to the Named Insured, the insurer would be unable to anticipate the amount of risk that would be undertaken by insuring any number of unknown parties who are unnamed at the time of contracting." *Id.* For these reasons, it awarded summary judgment against Seabulk.

The court then turned to the dispute between Seabulk and Dyn Marine, focusing first on whether Dyn Marine breached the Agreement "by failing to provide insurance coverage to Seabulk for injuries to third parties," and second on whether Dyn Marine "made material misrepresentations to Seabulk that wrongfully induced Seabulk" to execute the Agreement. *Id.* at 11. On the first issue, the court observed that, although the Agreement mandated that Dyn Marine procure and maintain CGL coverage, it did "not explicitly require coverage for risks at sea." *Id.* at 13. Accordingly, the court utilized parol evidence to determine "whether risks at sea were required to be covered simply by the requirement of a CGL policy." *Id.* at 14. Because "the experts and risk managers of both parties appear[ed] to agree that a standard CGL policy would contain a watercraft exclusion," the court concluded that the Agreement's requirement that Dyn Marine "provide a CGL policy [did] not in and of itself mandate coverage for risks at sea." *Id.* Consequently, the court viewed the "real issue" of the dispute as turning "on whether the language that require[d] the CGL policy to be primary to other coverage or that require[d] *in rem* coverage mandate[d] that Dyn [Marine] procure a policy with the standard watercraft exclusion deleted." *Id.* at 14-15.

On the question of whether the primary coverage requirement created an obligation on Dyn Marine to provide coverage for risks at sea, the court responded in the negative. It determined that, "[w]hile that

provision does support the proposition that the parties contemplated that there may be some occurrences which would be covered by the CGL policy and another policy (possibly, but not limited to, the P&I policy), it does not support the conclusion that those doubly-covered risks would necessarily be at sea." *Id.* at 15-16. As a result, the court refused to "read an additional coverage requirement into [the Agreement] simply because the parties contemplated that there may at times be coverage provided by two insurance policies." *Id.* at 16.

The court next assessed Seabulk's contention that the Agreement required Dyn Marine to provide coverage for risks at sea by mandating Dyn Marine to obtain *in rem* coverage. In rejecting this contention, the court reasoned that, "[b]ecause *in rem* coverage would protect an insured whenever an entity was sued, even if the occurrence happened on land, . . . the requirement of *in rem* coverage itself [did] not necessarily create a requirement that coverage for at sea risk be provided." *Id.* at 17. Accordingly, the court concluded that the Agreement did not require Dyn Marine to provide coverage for risks at sea, and it awarded summary judgment to Dyn Marine against Seabulk.

Finally, the court considered Seabulk's fraud claim, i.e., that Dyn Marine made "material misrepresentations regarding the insurance coverage it would obtain, and [that] Seabulk was wrongfully induced to enter into the [ ] Agreement." *Id.* at 18. On this issue, the court held that Seabulk failed to establish that false representations were made, and it awarded Dyn Marine summary judgment. *Id.* at 19. The court deferred ruling on Dyn Marine's counterclaim against Seabulk for breach of contract because briefing of that issue was incomplete. *Id.*

Thereafter, by its July Opinion, the court (1) granted summary judgment on Dyn Marine's breach of contract counterclaim against Seabulk (for failing to provide Dyn Marine P&I insurance), in the sum of $478,734.58, and (2) denied summary judgment on Seabulk's claim that it was required to provide P&I insurance only for injuries or illness to Dyn Marine's crews, rather than to third-party crewmen. In making these rulings, the court again considered parol evidence and found that, in general, P&I insurance covers injuries to third parties, and the P&I coverage requirement of the Agreement extended

Seabulk's obligation to provide coverage for the crew of the *Miss Debbie*. July Opinion at 6-7.

Seabulk has appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001). An award of summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We also review de novo a district court's decision on an issue of contract interpretation. *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 710 (4th Cir. 2001). The interpretation of a written contract is a question of law that turns upon a reading of the document itself, and a district court is in no better position than an appellate court to decide such an issue. *Hendricks v. Cent. Reserve Life Ins. Co.*, 39 F.3d 507, 512 (4th Cir. 1994).

## III.

Seabulk contends that the district court erred in awarding summary judgment to American Home and Dyn Marine on Seabulk's amended complaint and in awarding summary judgment to Dyn Marine on its counterclaim against Seabulk. Specifically, Seabulk maintains that it is entitled to summary judgment against American Home because the Policy is clear and unambiguous. In the alternative, Seabulk maintains that if the Policy is ambiguous, it must be strictly construed against American Home to provide coverage, or the dispute must be remanded for a jury determination on whether Seabulk is entitled to coverage. Seabulk also contends, inter alia, that if the Policy does not afford coverage, it is entitled to summary judgment against Dyn Marine for breach of contract because the Agreement required that Seabulk be provided with coverage.

### A.

A federal court resolving a diversity action is, absent a controlling constitutional provision or act of Congress, obliged to apply the substantive law of the state in which it sits, including the state's choice-of-law rules. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (observing that forum state's choice-of-law rules are substantive). This appeal arises from the Eastern District of Virginia and, pursuant to Virginia jurisprudence, an insurance policy is a contract to be construed in accordance with the principles applicable to all contracts. *Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co.*, 397 S.E.2d 876, 877 (Va. 1990). Questions concerning the validity, effect, and interpretation of a contract are resolved according to the law of the state where the contract was made. *Woodson v. Celina Mut. Ins. Co.*, 177 S.E.2d 610, 613 (Va. 1970) (applying principle of *lex loci contractus*). Under Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured. *Metcalfe Bros., Inc. v. Am. Mut. Liab. Ins. Co.*, 484 F. Supp. 826, 829 (W.D. Va. 1980). In this matter, the Policy was delivered to DynCorp, Dyn Marine's parent, at its offices in Reston, Virginia. As the district court properly recognized, therefore, a judicial assessment of the Policy is governed by Virginia law.

Under Virginia law, if policy language is clear and unambiguous, we do not apply rules of construction; rather, we give the language its plain and ordinary meaning and enforce the policy as written. *P'ship Umbrella, Inc. v. Fed. Ins. Co.*, 530 S.E.2d 154, 160 (Va. 2000). Conversely, when the policy language is ambiguous and the intentions of the parties cannot be ascertained, the policy must be construed strictly against the insurer and liberally in favor of the insured, so as to effect the dominant purpose of indemnity or payment to the insured. *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co.*, 316 S.E.2d 734, 736 (Va. 1984); *see also Grayson-Carroll-Wythe Mut. Ins. Co. v. Allstate Ins. Co.*, 582 F. Supp. 560, 564 (W.D. Va. 1984); *White Tire Distribs., Inc. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 367 S.E.2d 518, 519 (Va. 1988) (recognizing that, when policy language is susceptible to two constructions, it must be construed in favor of insured). Policy language is deemed ambiguous "when it may be

understood in more than one way or when such language refers to two or more things at the same time." *Salzi v. Va. Farm Bureau Mut. Ins. Co.*, 556 S.E.2d 758, 760 (Va. 2002); *see also Caldwell v. Transp. Ins. Co.*, 364 S.E.2d 1, 3 (Va. 1988) (observing that policy language is ambiguous when capable of two reasonable constructions).

B.

As explained below, our analysis of the Policy reveals that its pertinent provisions are clear and unambiguous, and that it affords CGL coverage to Seabulk for its damages in the Texas Litigation. We commence our analysis by examining the coverage generally provided by the Policy under its terms, endorsements, and exclusions. We then conclude that Seabulk is entitled to such coverage, and that its coverage is not limited to that afforded to Dyn Marine.

1.

As American Home concedes, the Policy provides CGL coverage for bodily injuries to third parties, risks associated with the ownership, use or entrustment of watercraft, and maritime risks occurring 100 miles into the Gulf of Mexico.[12] *See* Brief for Appellee at 8; *see also* Policy § I; *id.* at Watercraft Endorsement; *id.* at Coverage Territory Endorsement. Furthermore, American Home agrees that the Policy requires that *in rem* actions against watercraft are to be treated as *in personam* actions against insureds. *See supra* note 12; *see also* Policy at *In Rem* Endorsement. Generally speaking then, risks such as the Accident and its resulting Texas Litigation fall squarely within the ambit of the CGL coverage provided by the Policy and required by the Agreement. *See* Agreement § 8.1 (providing, in pertinent part, that Dyn Marine shall procure and maintain CGL coverage for "Bodily Injury and Property Damage," and Seabulk "shall be named [as] an Additional Insured" with its coverage being primary to any other

---

[12]In its Brief, American Home recognizes that Seabulk is "literally correct" in maintaining that the Policy: "'(1) cover[s] bodily injury to third parties, (2) cover[s] risks at sea, (3) delete[s] the standard watercraft exclusion thereby covering marine risks, (4) contains a maritime liabilities endorsement for *in rem* coverage, [and] (5) covers risks 100 miles into the Gulf of Mexico.'" Brief for Appellee at 8.

applicable coverage). Seabulk is entitled to such coverage as an additional insured on the basis of the Policy's Additional Insured Endorsement. This Endorsement extends to Seabulk the CGL insurance afforded by the Policy based on the Agreement's requirement that Dyn Marine provide CGL insurance to Seabulk covering the operation of the *Seabulk New Hampshire* and the *Seabulk Kentucky*. Policy at Additional Insured Endorsement (adding Seabulk as additional insured under Policy by virtue of Dyn Marine's obligation to furnish coverage "of the type provided by [the Policy]"); *see also* Agreement § 8.1.

2.

This dispute centers upon the extent of CGL coverage to which Seabulk is entitled under the Policy — which, significantly, the Additional Insured Endorsement addresses. This Endorsement explains that the CGL insurance provided by American Home will not exceed the lesser of (1) the coverage and/or limits of the Policy, or (2) the coverage and/or limits required by the Agreement. Policy at Additional Insured Endorsement. As the pertinent provisions of the Policy plainly reflect, American Home is obligated to provide coverage for "those sums that the insured [Seabulk] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage.'" Policy § I. Such coverage was required by the Agreement, which specifically mandated minimum coverage of "$5,000,000 per occurrence" with "no annual aggregate." Agreement § 8.1. Accordingly, an *in pari materia* assessment of the Additional Insured Endorsement and the Agreement demonstrates that Seabulk is entitled to CGL coverage for its damages stemming from the Accident in a sum not to exceed $5,000,000. As a consequence, the dispute between Seabulk and American Home hinges on one rather narrow issue: whether the Exposures Footnote in the Policy's Broad Named Insured Endorsement — an Endorsement entirely separate from the Additional Insured Endorsement — unambiguously limits the extent of Seabulk's CGL coverage to something less than that to which it is otherwise entitled under the Policy.[13]

---

[13]Our determination that this dispute hinges on the reach of the Exposures Footnote squares with American Home's characterization of the

On this point, American Home contends that, because the Exposures Footnote places a limitation on Dyn Marine's coverage, Seabulk's coverage as an additional insured through Dyn Marine is correspondingly limited.[14] We are constrained to disagree. As we have noted, Seabulk's coverage under the Policy derives from the Additional Insured Endorsement; Seabulk is thus afforded broader coverage than Dyn Marine because, pursuant to that Endorsement, Seabulk is entitled to the coverage generally provided by the Policy, limited only by its damages not to exceed $5,000,000. Though Dyn Marine would have us recognize an explicit limitation as to Seabulk in the Policy, there is none to be found in either the Additional Insured Endorsement or the Broad Named Insured Endorsement.

Put most simply, Dyn Marine derives its coverage from the Broad Named Insured Endorsement, whereas Seabulk derives its coverage from the Additional Insured Endorsement. The Additional Insured Endorsement provides that Seabulk is to be treated as an additional insured under the Policy as a result of the Agreement's requirement that Dyn Marine "furnish insurance to [Seabulk] . . . *of the type provided by [the Policy]*." Policy at Additional Insured Endorsement (emphasis added). And as we have explained, the coverage "provided by the Policy" consists of CGL coverage for bodily injuries to third parties, risks associated with the ownership, use or entrustment of watercraft, and maritime risks occurring 100 miles into the Gulf of Mexico. Accordingly, the Policy covers Seabulk in the Texas Litigation because the Additional Insured Endorsement, the genesis of Seabulk's coverage, provides the general CGL coverage afforded by the Policy and does not limit the extent of that coverage to the coverage

issue on appeal, i.e., "whether a limitation that expressly affects a specific Named Insured also applies to an additional insured whose rights to coverage under the [P]olicy are derived through that specific Named Insured." Brief for Appellee at 27. American Home agrees, then, that the issue we must resolve is not whether the Policy entitles Seabulk to coverage, but rather whether such coverage is limited by the Exposures Footnote.

[14]Although we recognize that Dyn Marine's CGL coverage is limited to "US Office Exposures *Only*," we express no view on the meaning of that limitation.

provided to Dyn Marine. As the Policy is clear and unambiguous on this point, we give effect to its plain and ordinary language and enforce it as written. *P'Ship Umbrella, Inc.*, 530 S.E.2d at 160. The Broad Named Insured Endorsement, and the Exposures Footnote embedded therein, are thus inapplicable to our resolution of this dispute.

In its determination that the Additional Insured Endorsement could not extend Seabulk greater coverage than that enjoyed by Dyn Marine, the district court was motivated by the concern that American Home would face unforeseeable insurance obligations, i.e., that "[i]f the scope of coverage were not subject to the same limitations as the coverage provided to the Named Insured, the insurer would be unable to anticipate the amount of risk that would be undertaken by insuring any number of unknown parties who are unnamed at the time of contracting." January Opinion at 9. This is not the situation, however, as the scope of Seabulk's coverage is limited to insurance "of the type provided by [the Policy]." Policy at Additional Insured Endorsement. American Home would therefore not be required to provide coverage beyond that set forth in the Policy. And the court's concern about the Policy extending coverage to "too many" additional insureds is an issue that falls squarely on the shoulders of American Home, which could have written the Policy to limit that possibility.

The primary decisions on which American Home relies to limit Seabulk's coverage are not at odds with our conclusion. First of all, American Home relies on the Tenth Circuit's decision in *Sonoco Products Co. v. Travelers Indemnity Co.*, 315 F.2d 126 (10th Cir. 1963). In *Sonoco*, the court observed that, under Texas law, an insurance policy does not extend any greater coverage to an additional insured than to the named insured "so as to insure such person for an unauthorized use when the named insured would not have been covered under the same circumstances." *Id.* at 128-29.

American Home's reliance on the *Sonoco* decision is misplaced. The Tenth Circuit there analyzed an omnibus clause of an automobile liability policy issued to a single named insured. *Id.* at 128. The omnibus clause purported to extend coverage to those using the automobile with the permission of the insured, and the court recognized that, while the clause was intended to extend coverage to others, it did not

alter the nature of coverage, the policy's declarations, or its exclusions. *Id.* Importantly, because that dispute involved a single named insured, his coverage was synonymous with that generally provided by the policy. In this dispute, on the other hand, the Policy covers many insureds, some of which (like Dyn Marine) do not enjoy the Policy's full CGL coverage because of certain exceptions.

The Exposures Footnote creates one such exception. Although the Exposures Footnote limits Dyn Marine's CGL coverage to "US Office Exposures *Only*," its plain language does not limit the coverage of an additional insured such as Seabulk. Indeed, the Broad Named Insured Endorsement — containing the Exposures Footnote — does not explicitly address the scope of coverage afforded to additional insureds under the Policy. Instead, the scope of such coverage is set forth in the Additional Insured Endorsement.

In further support of its position, American Home relies on our decision in *Tidewater Equipment Co. v. Reliance Insurance Co.*, 650 F.2d 503 (4th Cir. 1981). As its January Opinion reflects, the district court interpreted *Tidewater*, which relies on the views expressed in various insurance law treatises, to stand for the proposition that, "[w]henever a party receives coverage as an additional insured, that party's rights are limited by the terms and conditions of the insurance contract, as are the rights of the Named Insured."[15] January Opinion at 9 (citing *Tidewater Equip. Co.*, 650 F.2d at 506). As in *Sonoco*, *Tidewater* involved a single named insured, and its coverage was synonymous with that generally provided by the policy. Thus, *Tidewater* does not implicate the situation here, where the Policy provides differing coverage to a number of insureds. As such, *Tidewater*'s recog-

---

[15]The dispute in *Tidewater* involved three parties: Reliance, an insurer, provided coverage to its named insured, Keystone; in turn, Keystone entered into a contract to provide insurance to Tidewater. Thereafter, Keystone arranged for Tidewater to be listed as an additional insured under its policy issued by Reliance. In an action by Tidewater against Reliance for breach of the insurance contract, we accurately recognized that "Tidewater's right [of action] against Reliance is as an additional insured under the insurance contract between Keystone and Reliance, and as such is limited by the terms and conditions of that contract." *Tidewater Equip. Co.*, 650 F.2d at 506.

nition that the additional insured's coverage was limited in scope to the coverage provided to the named insured is not pertinent to the dispute before us.

Had American Home intended to limit Seabulk's coverage to "US Office Exposures *Only*," it could have done so. And it could have accomplished that purpose by simply providing, in the Additional Insured Endorsement or otherwise, that the coverage accorded an additional insured under the Policy is limited to that provided to the named insured through which it acquired its coverage. Because American Home failed to so limit Seabulk's coverage, Seabulk is entitled to the coverage generally provided *by the Policy*. Because the Policy affords Seabulk coverage, it is entitled to judgment to that effect.

### C.

### 1.

Our determination that the Policy affords Seabulk CGL coverage for its damages in the Texas Litigation does not end our inquiry. The district court's erroneous conclusion on that issue caused it to consider and rule upon Seabulk's alternative contentions in support of summary judgment against Dyn Marine, i.e., that Dyn Marine had breached the Agreement by failing to provide Seabulk with CGL coverage and a competent crew, and that Dyn Marine had fraudulently misrepresented its intentions during negotiations for the Agreement. Because the Policy provides Seabulk with CGL coverage, requiring the reversal of the summary judgment award to American Home, the court had no need to reach and address Seabulk's alternative contentions. Consequently, we must vacate that portion of the court's January Opinion awarding Dyn Marine summary judgment against Seabulk and dismissing Dyn Marine's cross-claim against American Home.[16]

---

[16]Under our decision today, Dyn Marine's cross-claim against American Home and American Home's motion for summary judgment against Dyn Marine may be resurrected on remand for such proceedings, if any, as may be consistent with our mandate.

2.

We also vacate the July Opinion awarding Dyn Marine summary judgment on its counterclaim against Seabulk. Significantly, when the court considered the Dyn Marine counterclaim, it believed, contrary to our conclusion today, that Seabulk was not entitled to CGL coverage under the Policy. For instance, in seeking summary judgment on its counterclaim against Seabulk, Dyn Marine did not support its motion solely by reference to the plain language of the Agreement. Rather, it also relied on the January Opinion — the decision we have now reversed — emphasizing that the district court had rejected Seabulk's position that the Policy covered the Texas Litigation and that such coverage was primary to the P&I insurance required by the Agreement. Dyn Marine's Mem. Supp. Summ. J. at 4-5. Indeed, Seabulk had maintained, in its motion for summary judgment of December 20, 2002, that the CGL and P&I insurance required by the Agreement were interrelated, in that the CGL insurance was specifically intended to extend coverage to third parties, whereas the P&I insurance was to provide coverage solely for the Dyn Marine crews. Seabulk's Mem. Supp. Summ. J. at 11, 15-16; *see generally* Seabulk's Mem. Opp. to Dyn Marine's Mot. Summ. J. Because the court may have considered Seabulk's coverage under the Policy as relevant to its determination that Seabulk is liable to Dyn Marine for damages, we vacate the July Opinion and remand for the court to consider the effect thereon, if any, of our decision today.[17]

IV.

Pursuant to the foregoing, we reverse the district court's award of summary judgment to American Home and direct the entry of judgment in favor of Seabulk. We vacate the award of summary judgment to Dyn Marine on the breach of contract and fraud claims asserted by Seabulk; we vacate the award of summary judgment to Dyn Marine

---

[17]Reconsideration of the issues concerning Dyn Marine's counterclaim is contingent, of course, upon whether Dyn Marine pursues that counterclaim.

on its counterclaim against Seabulk; and we remand for such further proceedings as may be warranted.

*REVERSED IN PART, VACATED IN PART, AND REMANDED*